14 CV 3406

JUDGE MARRERO

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LIANA CARRIER LTD., a foreign company;
and AMIR RIMON, an individual,

        Plaintiffs,

v.

PURE BIOFUELS CORP., a dissolved
Nevada corporation; PURE BIOFUELS DEL
PERU S.A.C., a foreign company; PURE
BIOFUELS HOLDINGS, L.P., a foreign
limited partnership; CARLOS ALBERTO
PINTO ROCHA, an individual; LUIS
HUMBERTO GOYZUETA ANGOBALDO,
an individual; GUSTAVO GOYZUETA, an
individual; and BRIAN S. ALPERSTEIN, an
individual,

        Defendants.

_____/

Case No.



## COMPLAINT AND DEMAND FOR JURY TRIAL

The plaintiffs (collectively, the "Plaintiffs"), LIANA CARRIER LTD. ("Liana") and

AMIR RIMON ("Rimon"), sue the defendants (collectively, the "Defendants"), PURE

BIOFUELS CORP. ("Pure Corp."), PURE BIOFUELS DEL PERU S.A.C. ("Pure del Peru"),

PURE BIOFUELS HOLDINGS, L.P. ("Pure Holdings"), CARLOS ALBERTO PINTO ROCHA

("Pinto"), LUIS HUMBERTO GOYZUETA ANGOBALDO ("L. Goyzueta"), GUSTAVO

GOYZUETA ("G. Goyzueta"), and BRIAN S. ALPERSTEIN ("Alperstein"), and allege as

follows:

### INTRODUCTION

1.     This is an action by Plaintiffs to recover damages arising from (a) the violations

of 15 U.S.C. § 78j(b) ("Section 10(b)") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") committed by

Pure Corp., Pinto, L. Goyzueta, and G. Goyzueta, (b) Pure Corp.'s breach of its investment contracts with the Plaintiffs, (c) Pinto's negligent or fraudulent misrepresentations, which were made both individually and on behalf of Pure Corp., and which induced the Plaintiffs into entering said investment contracts, investing approximately $5,500,000.00 under the terms thereof, and holding the same at a time when they would have sold, (d) G. Goyzueta's aiding and abetting Pinto's fraud, (e) Pinto's, L. Goyzueta's, and G. Goyzueta's breaches of their fiduciary duties to the Plaintiffs, and (f) L. Goyzueta's, G. Goyzueta's, and Alperstein's aiding and abetting Pinto's breaches of his fiduciary duties, and G. Goyzueta's and Alperstein's aiding and abetting L. Goyzueta's breaches of his fiduciary duties. To the extent that Pure Corp. is liable to the Plaintiffs, Pure del Peru is liable to the Plaintiffs as Pure Corp.'s alter ego, and Pure Holdings is liable to the Plaintiffs as Pure Corp.'s successor through a de facto merger.

## PARTIES, JURISDICTION, AND VENUE

2.      Liana is a foreign company that was originally organized under the laws of Liberia and maintains its principal place of business in the United Kingdom.  Through a re-domiciliation process, Liana became a Maltese company, but it still maintains its principal place of business in the United Kingdom.

3.      Rimon is a citizen of Israel and otherwise *sui juris*.

4.      Pure Corp. was, prior to its dissolution, a publicly traded Nevada corporation that maintained its principal place of business in Texas.  Pure Corp. was a holding company that wholly owned and directed the affairs of Pure del Peru.

5.      Pure del Peru is a foreign company that was organized under the laws of Peru and maintains its principal place of business in Peru.  Pure del Peru was the operating company of

Pure Corp. before it was transferred to Pure Holdings.  Pure del Peru was and is purportedly in the business of trading and producing fuel.

6.      Pure Holdings is a limited partnership that was organized under the laws of the Province of Alberta, Canada, for the purpose of acquiring and holding Pure del Peru.  The general partner of Pure Holdings is Pegasus Investors V (IH), L.P., a Cayman Islands exempted limited partnership and, upon information and belief, subsidiary of Pegasus Capital Advisors, L.P., a Delaware limited partnership that maintains places of business in New York and Connecticut.  Employees of Pegasus Capital Advisors, L.P., currently serve on Pure del Peru's Board of Directors.

7.      Pinto is a citizen of Peru and otherwise *sui juris*.  Pinto was the Chief Operating Officer (COO) of Pure Corp. between 2006 and 2010, when he became the Chief Executive Officer (CEO) of Pure Corp.  During this period, Pinto also served on Pure Corp.'s Board of Directors.  Pinto is currently the CEO of Pure del Peru and a member of its Board of Directors.

8.      L. Goyzueta is a citizen of Peru and otherwise *sui juris*.  L. Goyzueta was the CEO of Pure Corp. between 2006 and 2010.  During this period, L. Goyzueta also served on Pure Corp.'s Board of Directors.

9.      G. Goyzueta is a citizen of Peru and otherwise *sui juris*.  G. Goyzueta was the Chief Financial Officer (CFO) of Pure Corp. between 2006 and 2010.  During this period, G. Goyzueta also served on Pure Corp.'s Board of Directors.

10.      Alperstein is a citizen of the United States residing in Peru and/or Virginia and otherwise *sui juris*.  Alperstein is an American attorney licensed to practice law in Virginia and the District of Columbia.  At all material times, Alperstein was the Secretary, Treasurer, and General Counsel of Pure Corp.  Alperstein is currently Pure del Peru's General Counsel.

3

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Pure Corp., Pure del Peru (as Pure Corp.'s alter ego), and Pure Holdings (as Pure Corp.'s successor through a de facto merger) pursuant to N.Y. Gen. Oblig. Law § 5-1402 and other applicable law by virtue of a clause in the subject investment contracts by which the parties agreed that New York law would govern the same in accordance with N.Y. Gen. Oblig. Law § 5-1401.

13.     This Court has personal jurisdiction over Pure Corp., Pure del Peru (as Pure Corp.'s alter ego), Pure Holdings (as Pure Corp.'s successor through a de facto merger), Pinto, L. Goyzueta, and G. Goyzueta pursuant to 15 U.S.C. § 78aa.

14.     Upon information and belief, this Court has personal jurisdiction over all of the Defendants pursuant to N.Y. CPLR § 301, N.Y. CPLR § 302, and/or other applicable law.

15.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(3) and other applicable law.

## GENERAL ALLEGATIONS

### A. Acquisition of Pure del Peru

16.     Pure del Peru was and is a Peruvian company purportedly in the business of trading fuel and producing biofuel, which is fuel created from living organisms such as plants.

17.     Pure del Peru was acquired by Pure Corp. through a share exchange on or about July 26, 2006.

18.     Pursuant to the terms of this exchange, Pure Corp. received all of Pure del Peru's outstanding shares in exchange for 29,999,970 shares of stock in Pure Corp., which caused Pure Corp. to have 55,031,228 shares issued and outstanding by September 15, 2006.

**B. Appointment and Material Affiliations of Pinto, L. Goyzueta, and G. Goyzueta**

19.    At around the same time, Pinto, L. Goyzueta, and G. Goyzueta became officers and directors of Pure Corp.; Pinto became its COO, L. Goyzueta became its CEO, and G. Goyzueta, who is L. Goyzueta's brother, became its CFO.

20.    Prior to and after becoming Pure Corp.'s COO, Pinto served as President of Ocean Marine S.A.C. ("OceanMarine"), a Peruvian shipping company, and maintained an ownership interest in Trimarine Corporation S.A. ("Trimarine"), a Panamanian shipping company, Interpacific Oil S.A.C. ("Interpacific"), a Peruvian company purportedly in the business of trading fuel, and FDS Corporation S.A. ("FDS"), a Panamanian company.

21.    L. Goyzueta also maintained an ownership interest in Interpacific.

**C. Accession of Capital Through Public and Private Investments**

22.    When Pure del Peru was acquired by Pure Corp., it did not have the capacity to produce biofuel and had not generated any significant revenue.

23.    However, Pure Corp. publicly and privately raised the capital necessary to develop a biodiesel processing plant at the Callao Port in Lima, Peru (the "Callao Port Facility"), which would enable Pure del Peru to begin production.

24.    Shares of stock in Pure Corp. were sold in an efficient market to individuals residing in New York and elsewhere in the United States through the Over-the-Counter Bulletin Board (OTCBB) under the symbol "PBOF.OB" and to foreign accredited investors through private placements.

**D. Initial Filing of Materially Misleading Reports**

25.    As a publicly traded company, Pure Corp. was required to comply with certain disclosure requirements by filing reports with the Securities Exchange Commission (SEC).

26.     Pinto, L. Goyzueta, and G. Goyzueta had access to certain key information that was not available to the public, including adverse information concerning the operations, operational trends, financial condition, and business prospects of Pure Corp. and Pure del Peru.

27.     Pinto, L. Goyzueta, and G. Goyzueta, collectively and, at times, singly, had control and the final say as to whether and to what extent this information was disclosed in the reports filed with the SEC or otherwise made available to investors and the public.

28.     In exercising this control, Pinto, L. Goyzueta, and G. Goyzueta acted individually and on behalf of Pure Corp. as Pure Corp.'s agents and controlling officers and directors.

29.     In certain of its public filings between 2006 and 2007, Pure Corp. initially estimated that it would need to raise approximately $11,000,000.00 to build the Callao Port Facility and commence production of biofuel by 2007.

30.     However, this estimated cost and date of initial production were knowingly or ngeligently understated.  Indeed, over the course of several years, the estimated cost to complete the Callao Port Facility and commence production of biofuel increased to well over $100,000,000.00, and no considerable revenue was generated from the production of biofuel until many years later.

31.     Anticipated revenue was also knowingly or negligently exaggerated in Pure Corp.'s public filings through the inclusion of an overstated profit margin in its fuel trading sector.  Specifically, the amounts at which Pure Corp. would buy and sell fuel to third parties were misrepresented so as to create the appearance that Pure Corp. had greater business prospects than it actually had.

32.     Accordingly, Pure Corp.'s public filings were materially misleading at best, and Pinto, L. Goyzueta, and G. Goyzueta knew or should have known they were materially misleading when they were filed.

33.     These misrepresentations were made in Pure Corp.'s public filings for the purpose of leading investors into believing that investments in Pure Corp. would be profitable because Pure Corp. was a thriving company whose income would soon dramatically increase.

**E. Investors' Reliance on Materially Misleading Statements and Plaintiffs' Investments**

34.     The Plaintiffs and other investors relied on the purported truthfulness of these filings and accuracy of the market price of Pure Corp.'s shares in deciding to invest millions of dollars into Pure Corp.

35.     In fact, certain of the misrepresentations contained in Pure Corp.'s public filings were made directly to the Plaintiffs by Pinto, individually and on behalf of Pure Corp., on or about November 12, 2007, during a presentation that was delivered for the purpose of securing the Plaintiffs' investment.

36.     Pinto specifically represented to the Plaintiffs that it was absolutely the perfect time to invest in Pure Corp., as it would have total sales of approximately $148,563,025.00 in 2008 (netting $4,407,578.00 of income), $388,215,114.00 in 2009 (netting $31,949,349.00 of income), $392,895,021.00 in 2010 (netting $48,911,246.00 of income), $412,560,481.00 in 2011 (netting $90,304,394.00 of income), and $417,225,942.00 in 2012 (netting $118,454,086.00 of income).

37.     Upon information and belief, the statements containing these exagerated figures were prepared by G. Goyzueta.

38.    Pinto knew or should have known these figures were absolutely unattainable when he presented them to the Plaintiffs, for Pure Corp. had no customers, was operating at a deficit, did not produce biofuel, and would not be in a position to generate any considerable revenue until years later. Indeed, just a few months after the presentation, Pure Corp. disclosed in its 10-K for 2008 that the estimated date of initial production had been pushed back to the second quarter of 2009.

39.    Nevertheless, the Plaintiffs entered two certain Private Placement Subscription Agreements (collectively, the "Subscription Agreements") in justifiable reliance upon Pinto's misrepresentations and those contained in Pure Corp.'s public filings. A true and correct copy of one of the Subscription Agreements is attached hereto as **Exhibit "A"** and incorporated herein.

40.    Indeed,   the   Subscription   Agreements   contain   the   following   express representation:

> 8.4  The Company [Pure Corp.] has filed all reports, schedules, forms, statements and other documents required to be filed by the Company under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date hereof . . . (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein, being collectively referred to herein as the "SEC Reports") . . . As of their respective dates, the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

Exhibit "A".

41.    The Subscription Agreements also contain the following choice-of-law provision:

> 14.1  This Subscription Agreement is governed by the laws of the State of New York. The Subscriber, in its personal or corporate capacity and, if applicable, on behalf of each beneficial purchaser

for whom it is acting, irrevocably attorns to the jurisdiction of the State of New York.

*Id.*

42.     Pursuant to the Subscription Agreements, Pure Corp. transferred 15,714,287 shares of its stock to the Plaintiffs on August 14, 2008, in exchange for $5,500,000.00, or approximately $0.35 per share.

43.     The price per share that the Plaintiffs paid reflected the misleading statements that were contained in Pure Corp.'s public filings and made directly to the Plaintiffs by Pinto, both individually and on behalf of Pure Corp.

## F.   **Subsequent Filing of Materially Misleading Reports, Self-Dealing, and Lack of Reasonable Care or Good Faith**

44.     Pure Corp.'s subsequent public filings were just as misleading as those that the Plaintiffs relied upon in entering into the Subscription Agreements.

45.     Moreover, Pinto, L. Goyzueta, and G. Goyzueta caused Pure Corp. to enter into numerous disadvantageous and inadequately disclosed agreements with companies they owned or controlled.

46.     In so doing, Pinto was knowingly assisted and/or advised by L. Goyzueta, G. Goyzueta, and Alperstein; and L. Goyzueta was knowingly assisted and/or advised by G. Goyzueta and Alperstein.

### i.   *The Interpacific Deal*

47.     In 2007, Pure Corp. acquired Interpacific, a company that was owned by Pinto and L. Goyzueta, for approximately $6,300,000.00 based on false and misleading financial statements created by G. Goyzueta.

48.     Interpacific was worth nothing near $6,300,000.00 at the time it was acquired by Pure Corp.

49.    Interpacific's assets, which consisted primarily of fuel tanks and a leasehold interest in a biodiesel production facility (the "Interpacific Facility"), were appraised by Pinto and L. Goyzueta's personal friends at an amount that greatly exceeded their true value, and G. Goyzueta knew this.

50.    At least one independent appraiser subsequently valued Interpacific's assets at approximately $350,000.00.

51.    Indeed, Pure Corp.'s March 2008 10-Q indicates that the Interpacific Facility opened in 2001, but, in fact, it did not become operational until 2008, after additional construction, which was improperly characterized as an expansion in the public filnigs, at Pure Corp.'s expense.

52.    To this day, the Interpacific Facility has not generated commercial quantities of biofuel.

### ii.   The OceanMarine Deal

53.    Later on in 2007, Pure Corp. entered into an agreement with OceanMarine, which was controlled by Pinto.

54.    Under the terms thereof, Pure Corp. would purportedly receive advisory services related to the use and handling of biofuel in exchange for a lump sum payment of $309,166.00 for services allegedly rendered between September 15, 2006, and June 30, 2007, as well as a monthly fee of $34,000.00 from July 1, 2007, through August 12, 2009.

55.    However, no services were ever provided by OceanMarine, and Pure Corp. had still not produced a single drop of biofuel at the time.

56.    L. Goyzueta and G. Goyzueta approved of Pure Corp.'s agreement with OceanMarine, notwithstanding their knowledge that OceanMarine was controlled by Pinto and that OceanMarine would provide no services to Pure Corp. thereunder.

### iii.  The Need for More Capital

57.    By 2008, well over $50,000,000.00 had been raised to complete construction of the Callao Port Facility and begin the production of biofuel.  However, little to no revenue had been generated, and Pure Corp. indicated it would need approximately $50,000,000.00 more to commence production.

58.    The need for all of this additional capital was economically rationalized by the purported expected profits that Pure Corp. would enjoy once it finally began producing and selling biofuel; but, contrary to the representations contained in Pure Corp.'s public filings, Pure Corp. did not have any true sales agreements to fulfill.

59.    In fact, although Pure Corp.'s 10-K for 2008 indicates that Pure Corp. had "already signed certain non-binding, pre-sale agreements with local Peruvian fuel distributors for the entire anticipated production from the Callao Port Facility and the Interpacific Facility," OceanMarine was the only "fuel distributor" with whom Pure Corp. had a signed agreement, and OceanMarine's fuel distribution permits were revoked for a period due to a lapse of time during which it distributed no fuel.

60.    At around the same time, Pure Corp.'s annual operating expenses had increased from approximately $840,000.00 to $6,000,000.00 due, in part, to increased salaries, management's use of corporate funds for personal purposes, and sham service and supply contracts with insiders and companies owned and/or controlled by insiders.

61. For example, Pure Corp. paid nearly $1,000,000.00 pursuant to an agreement with Capricorn del Peru S.A.C. for certain designs related to the Callao Port Facility. However, this company was owned by L. Goyzueta and G. Goyzueta and had no experience in this area.

62. Consequently, Pure Corp. experienced a cash crunch that the Plaintiffs' investment alone could not cure.

### iv. The Initial FDS Deals

63. By the end of 2008, Pure Corp. needed capital to continue as a going concern, but Pinto and Alperstein engaged in conduct which was calculated to and did ensure that the only financing opportunities that were presented to Pure Corp.'s Board of Directors were extremely disadvantageous offers made by FDS, a Panamanian company secretly owned by Pinto.

64. Pinto misrepresented to Pure Corp.'s Board of Directors and its successor CFO, Juan Antonio Santoyo-Ruiz ("Santoyo"), that FDS was a foreign third party, although, upon information and belief, L. Goyzueta, G. Goyzueta, and Alperstein knew, at all material times, that Pinto had an ownership interest in FDS.

65. Due to the lack of alternative financing offers and the urgent need for capital, Pure Corp. entered into a number of transactions with FDS between 2008 and 2010 that severely diluted the Plaintiffs' shares through the issuance of millions of warrants, whereby FDS had the option of purchasing a certain number of newly issued shares of Pure Corp.'s stock from Pure Corp. at a very low price or, in many cases, in exchange for the warrants themselves.

66. Moreover, Plainfield Peru I LLC ("Plainfield"), Pure Corp.'s largest shareholder at the time, required the issuance of millions of warrants in its favor before it would approve of the FDS transactions in order to ensure that its shares were not diluted. This magnified the negative effect that the FDS transactions had on the Plaintiffs' investment.

67.    The first loan that FDS made to Pure Corp. was in the principal amount of $1,000,000.00.

68.    This loan was made on December 4, 2008, and matured on January 15, 2009.

69.    In exchange for the loan, Pure Corp. issued FDS seven-year warrants to purchase 6,666,666 shares of Pure Corp.'s stock at $0.30 per share, which was $0.05 per share less than the amount the Plaintiffs paid just a few months earlier.

70.    Moreover, if Pure Corp. failed to repay the $1,000,000.00 by January 15, 2009, FDS would be entitled to both (1) seven-year warrants to purchase an additional 26,666,666 shares of common stock from Pure Corp. at $0.30 per share, and (2) at the option of FDS, either (a) a three-month loan with interest at 15% per annum or (b) shares of Pure Corp.'s stock equal to the unpaid principal balance at a conversion rate of $0.30 per share.

71.    Not surprisingly, Pure Corp. defaulted, and FDS received the seven-year warrants to purchase 26,666,666 shares, which were later estimated to have a market value of $1,576,763.00, and elected to convert the loan to a three-month loan with interest at 15% per annum.

72.    FDS lent Pure Corp. an additional $500,000.00 on April 28, 2009, and $250,000.00 on June 18, 2009.

73.    These loans matured on May 30, 2009, and June 30, 2009, respectively.

74.    On maturity, Pure Corp. was required to pay FDS $525,000.00 to satisfy the first loan and $262,500.00 to satisfy the second.

75.    If these amounts were not timely paid, then, under the terms of the loans, FDS would be additionally entitled to seven-year warrants to purchase a total of 18,650,000 shares of Pure Corp.'s stock at $0.04, which is $0.31 per share less than the amount the Plaintiffs paid.

76.     Moreover, these warrants could, at the option of FDS, be exchanged at any time during the seven years for 15,625,000 shares of Pure Corp.'s stock without any payment.

77.     Pure Corp. defaulted, and FDS received these warrants, which were later estimated to have a market value of $2,033,793.00.

78.     In March 2009, FDS posted a $2,500,000.00 bond in favor of Pure Corp. for a term of twelve months, which was purportedly required for Pure Corp. to operate the Callao Port Facility as a bonded warehouse.

79.     In exchange for posting this bond, Pure Corp. paid FDS a monthly interest payment of $31,250.00, which is equal to 15% per annum, and issued FDS seven-year warrants to purchase 62,500,000 shares of Pure Corp.'s stock at $0.05 per share.

80.     Moreover, these warrants could, at the option of FDS, be exchanged at any time during the seven years for 52,083,333 shares of Pure Corp.'s stock without any payment.

81.     These warrants were later estimated to have a market value of $4,085,589.00.

82.     Additionally, at the end of the first twelve months, Pure Corp. paid FDS $30,000.00 to renew the bond for another twelve-month term.

### v.  *The Trimarine Deal*

83.     At around the same time, Pure Corp. entered into a credit agreement with Trimarine, a company in which Pinto maintained an ownership interest.

84.     Under the terms of this agreement, Trimarine agreed to provide Pure Corp. with a $40,000,000.00 line of credit to purchase petroleum products from Trimarine in exchange for a 10% down payment of $4,000,000.00 and warrants that had a market value of $1,400,518.00.

85.     However, Trimarine was a shipping company and, accordingly, had no significant petroleum products to sell.

86.     Furthermore, as Pinto owned both Trimarine and FDS, it appears as though Pinto used the same money it lent Pure Corp. through FDS to pay Trimarine the down payment for the credit facility, in effect repaying himself and acquiring an additional $1,400,518.00 worth of warrants in the process. If this is the case, two of Pinto's companies, Trimarine and FDS, would have collectively received for absolutely nothing $18,370,926.00 worth of cash and warrants between December 2008 and July 2009 alone pursuant to the aforementioned transactions, as well as a guaranteed monthly payment of $31,250.00 from July 2009 until March 2011, and the right to receive an additional $5,350,00.00, which would eventually be paid with funds borrowed from Interbank Peru. These figures do not take into account monies received by Pinto pursuant to his personal contracts with Pure Corp., the corporate funds he spent on personal extravagances (e.g., vacations and fine dining), or the sham consulting agreements referenced above.

### vi.  The Final FDS Deal

87.     On June 4, 2010, FDS lent Pure Corp. $1,100,000.00 for three months in exchange for seven-year warrants to purchase 43,421,053 shares of Pure Corp.'s stock at $0.076 per share.

88.     These warrants could, at the option of FDS, be exchanged any time during the seven years for 36,184,211 shares of Pure Corp.'s stock without any payment.

89.     These warrants were later determined to have a market value of $2,015,130.00.

90.     Pure Corp. subsequently defaulted under the terms of this loan and, as a result, was required to issue FDS seven-year warrants to purchase 289,473,684 shares of Pure Corp.'s stock at $0.076 per share.

91.     These warrants were later determined to have a market value of $8,379,133.00.

92.     Pure Corp. reported that the market value of the warrants that it was required to issue FDS and Plainfield in 2010 alone equaled $43,553,158.00.

### vii. Investors' Loss and Miscellaneous Deals

93.     Through this improper conduct, Pinto, L. Goyzueta, and G. Goyzueta caused Pure Corp. to pay millions of dollars and issue millions of additional outstanding shares to third parties that were owned and/or controlled by Pinto, L. Goyzueta, and/or G. Goyzueta; and, as a result, the value and voting privileges associated with the shares held by the Plaintiffs and other minority shareholders were heavily reduced.

94.     The value of the Plaintiffs' shares further decreased by virtue of a number of additional sham transactions in which Pure Corp. engaged throughout 2009 and 2010, and through which Pinto, L. Goyzueta, and/or G. Goyzueta pilfered even more money from Pure Corp.

95.     In 2009, for example, Pure Corp. entered into a service agreement with Challenge Capital Corporation, which was controlled by certain undisclosed officers of Pure Corp.

96.     Pursuant to this contract, Challenge Capital Corporation agreed to provide "services related to the handling of biofuels" in exchange for a monthly payment of $25,699.00.

97.     However, Challenge Capital Corporation provided no such services.

98.     Later in 2009, Pure Corp. received a loan in the amount of $43,000,000.00 from Interbank Peru, part of which was used to repay the $5,350,000.00 owed to FDS.

### G. Deregistration of Pure Corp.'s Securities

99.     The well eventually ran dry in 2010, and Pure Corp.'s management decided that Pure Corp. would need to be eliminated if the operation was going to survive.

100.    Pinto in particular was concerned about outside auditors reviewing Pure Corp.'s credit card statements and the conflicting appraisals of Interpacific's assets.

101.    Accordingly, Pure Corp. "went dark" (i.e., deregistered its securities) on January 3, 2011, and its reporting obligations under the Securities Exchange Act of 1934 ("Exchange Act") were terminated.

**H. Elimination of Pure Corp. and Transfer of Pure del Peru to Pure Holdings**

102.    On or about May 10, 2012, the Plaintiffs received notice that PBC Acquisition LLC, which is ostensibly a company that eventually received the shares that FDS and Plainfield acquired through the aforementioned transactions, merged into Pure Corp. by virtue of a certain Plan of Merger dated April 30, 2012.

103.    Under this Plan, Pure Corp.'s outstanding shares prior to the merger, including the Plaintiffs' shares, were cancelled and converted into the right to receive $0.00832 per share in cash.

104.    Thereafter, Pure del Peru was transferred to Pure Holdings, which was formed to acquire and hold Pure del Peru.

105.    In fact, Pure Holdings carries on the exact same business that Pure Corp. engaged in prior to the April 30, 2012, merger.

106.    Moreover, Pure del Peru has continued its business virtually uninterrupted with the same management, personnel, physical location, assets, and general business operations.

107.    After Pure del Peru was transferred to Pure Holdings, Pure del Peru announced that it had been acquired by management and Pegasus Capital Advisors L.P., a private equity fund manager with offices in Connecticut and New York.

108.    Pure Corp. subsequently dissolved.

**I. Concealment of Improper Conduct**

109.    The Plaintiffs were not aware of the self-dealing, lack of reasonable care and good faith, or misrepresentations described above until well after they received notice of the merger on or about May 10, 2012.

110.    Although the Plaintiffs often contacted Pinto during the life of their investment to see how it was doing, Pinto never told them the truth about Pure Corp.'s financial condition or business prospects.

111.    In fact, Pinto, individually and on behalf of Pure Corp., frequently represented to the Plaintiffs that Pure Corp. was improving and that their investment would soon be profitable.

112.    These statements were false, and Pinto made them for the purpose of discouraging the Plaintiffs from selling their shares or inquiring any further.

113.    Indeed, the Plaintiffs justifiably relied upon these misrepresentations in refraining from either exploring the possibility of selling their shares or making additional efforts to discover Pure Corp.'s true condition.

114.    Pinto also inhibited Pure Corp.'s outside auditors and independent directors from discovering the truth about all of the transactions that effectively crippled Pure Corp.

115.    Pinto outright lied to Pure Corp.'s successor CFO, Santoyo, about the true nature of FDS, Trimarine, and OceanMarine, and he blocked Santoyo from accessing certain key documents, many of which were taken by G. Goyzueta with Pinto's tacit approval upon his resignation.

116.    Santoyo has requested the return of these documents along with G. Goyzueta's computer, which was also taken, on several occasions, but G. Goyzueta refuses to return them,

and Pinto has not required G. Goyzueta to return them, claiming that they are "safe" in an undisclosed location.

117.    Even as Pure del Peru was in the process of being sold, Pinto refused to disclose information that should have been made available to competing buyers, such as the Plaintiffs, because he had a personal interest in the transaction.

118.    Through this bad faith conduct, the Plaintiffs were kept in the dark as to why and how their $5,500,000.00 investment was eviscerated.

119.    The Plaintiffs have retained the undersigned law firm and are obligated to pay a reasonable fee for its services in connection with this lawsuit.

120.    All conditions precedent to this lawsuit have occurred, have been waived, or are otherwise excused.

**COUNT I**
**VIOLATIONS OF SECTION 10(b) AND RULE 10b-5**
**(Against Pure Corp., Pure del Peru, Pure Holdings, Pinto, L. Goyzueta, and G. Goyzueta)**

121.    The Plaintiffs reassert the allegations contained in paragraphs 1 through 120 as if fully set forth herein.

122.    As a publicly traded company, Pure Corp. was required to comply with certain disclosure requirements by filing reports with the SEC.

123.    Pinto, L. Goyzueta, and G. Goyzueta had access to certain key information that was not available to the public, including adverse information concerning the operations, operational trends, financial condition, and business prospects of Pure Corp. and Pure del Peru.

124.    Pinto, L. Goyzueta, and G. Goyzueta, collectively and, at times, singly, had control and the final say as to whether and to what extent this information was disclosed in the reports filed with the SEC or otherwise made available to investors and the public.

125.   In exercising this control, Pinto, L. Goyzueta, and G. Goyzueta acted individually and on behalf of Pure Corp. as Pure Corp.'s agents and controlling officers and directors.

126.   Pinto, L. Goyzueta, and G. Goyzueta, individually and on behalf of Pure Corp., made material misrepresentations and omissions by, *inter alia*, knowingly understating the costs to complete the Callao Port Facility, overstating the anticipated revenue that would be generated through trading and producing fuel, mischaracterizing the transactions with Interpacific, OceanMarine, Trimarine and other firms owned and/or controlled by insiders, exaggerating the assets of Interpacific, and failing to disclose Pinto's ownership interest in FDS.

127.   Pinto, L. Goyzueta, and G. Goyzueta made these material representations and omissions with actual knowledge that they were false and misleading, and with a mental state embracing an intent to deceive or manipulate.

128.   These material misrepresentations and omissions artificially altered Pure Corp.'s market price per share, which led to investors buying when they would have passed, selling when they would have held, and holding when they would have sold.

129.   The Plaintiffs relied on these material misrepresentations and omissions and Pure Corp.'s market price per share in entering into the Subscription Agreements and purchasing and holding their shares of stock in Pure Corp.

130.   As a result of these material misrepresentations and omissions, the Plaintiffs suffered economic loss that they would not have otherwise sustained.

131.   Pinto, L. Goyzueta, and G. Goyzueta are directly liable for this economic loss.

132.   To the extent that Pinto, L. Goyzueta, or G. Goyzueta are not directly liable for this economic loss, they are secondarily liable for the Plaintiffs' injuries as control persons under 15 U.S.C. § 78t (Section 20 of the Exchange Act).

133.   Pure Corp. is liable for the Plaintiffs' injuries because Pinto, L. Goyzueta, and G. Goyzueta's culpable acts were committed in their capacity as agents of Pure Corp. and within the scope of their employment as controlling officers and directors of Pure Corp., and, therefore, their acts and accompanying mental states are attributable to Pure Corp.

134.   As Pure Corp.'s alter ego, Pure del Peru is liable for the Plaintiffs' injuries to the same extent that Pure Corp. is liable.

135.   As Pure Corp.'s successor through a de facto merger, Pure Holdings is liable for the Plaintiffs' injuries to the same extent that Pure Corp. is liable.

WHEREFORE, the Plaintiffs LIANA CARRIER LTD. and AMIR RIMON respectfully request that this Court enter a judgment against Defendants PURE BIOFUELS CORP., PURE BIOFUELS DEL PERU S.A.C., PURE BIOFUELS HOLDINGS, L.P., CARLOS ALBERTO PINTO ROCHA, LUIS HUMBERTO GOYZUETA ANGOBALDO, and GUSTAVO GOYZUETA for the damages sustained as a result of the violations of Section 10(b) and Rule 10b-5, together with Plaintiffs' reasonable attorneys' fees, costs, and such other and further relief as this Court deems appropriate.

## COUNT II
## NEGLIGENT MISREPRESENTATION
**(Against Pure Corp., Pure del Peru, Pure Holdings, and Pinto)**

136.   The Plaintiffs reassert the allegations contained in paragraphs 1 through 120 as if fully set forth herein.

137.   On or around November 12, 2007, Pinto, individually and on behalf of Pure Corp., made false representations to the Plaintiffs regarding Pure Corp.'s operations and business prospects.

138.    Pinto specifically represented to the Plaintiffs that it was absolutely the perfect time to invest in Pure Corp., as it would have total sales of approximately $148,563,025.00 in 2008 (netting $4,407,578.00 of income), $388,215,114.00 in 2009 (netting $31,949,349.00 of income), $392,895,021.00 in 2010 (netting $48,911,246.00 of income), $412,560,481.00 in 2011 (netting $90,304,394.00 of income), and $417,225,942.00 in 2012 (netting $118,454,086.00 of income).

139.    Pinto should have known these representations were false.

140.    At the time Pinto made these representations, Pinto and Pure Corp. had a duty, as a result of their relationship with the Plaintiffs, to give the Plaintiffs correct information.

141.    Pinto made these representations with knowledge that the Plaintiffs wanted the information for the purpose of determining whether they should invest $5,500,000.00 into Pure Corp.

142.    The Plaintiffs justifiably relied upon these false representations in entering into the Subscription Agreements and investing $5,500,000.00 under the terms thereof.

143.    The Plaintiffs' investment is now virtually worthless.

144.    During the life of the investment, Pinto, individually and on behalf of Pure Corp., made false representations to the Plaintiffs regarding Pure Corp.'s financial condition and business prospects.

145.    Pinto frequently represented to the Plaintiffs that Pure Corp. was improving and that their investment would soon be profitable.

146.    These representations were false, and Pinto should have known they were false when he made them.

147.    At the time these representations were made, Pinto and Pure Corp. had a duty, as a result of their relationship with the Plaintiffs, to give the Plaintiffs correct information.

148.    Pinto made these representations with knowledge that the Plaintiffs wanted the information for the purpose of determining whether they should hold or sell their shares.

149.    The Plaintiffs justifiably relied upon these representations in refraining from exploring the possibility of selling their shares at a time when they would have been worth more than what they are worth now.

150.    As Pure Corp.'s alter ego, Pure del Peru is liable for the Plaintiffs' injuries to the same extent that Pure Corp. is liable.

151.    As Pure Corp.'s successor through a de facto merger, Pure Holdings is liable for the Plaintiffs' injuries to the same extent that Pure Corp. is liable.

WHEREFORE, the Plaintiffs LIANA CARRIER LTD. and AMIR RIMON respectfully request that this Court enter a judgment against Defendants PURE BIOFUELS CORP., PURE BIOFUELS DEL ·PERU S.A.C., PURE BIOFUELS HOLDINGS, L.P., and CARLOS ALBERTO PINTO ROCHA for the damages sustained as a result of the negligent misrepresentation, together with Plaintiffs' reasonable attorneys' fees, costs, and such other and further relief as this Court deems appropriate.

## COUNT III
## FRAUD
### (Against Pure Corp., Pure del Peru, Pure Holdings, and Pinto)

152.    The Plaintiffs reassert the allegations contained in paragraphs 1 through 120 as if fully set forth herein.

153. On or around November 12, 2007, Pinto, individually and on behalf of Pure Corp., made false representations to the Plaintiffs regarding Pure Corp.'s operations and business prospects.

154. Pinto specifically represented to the Plaintiffs that it was absolutely the perfect time to invest in Pure Corp., as it would have total sales of approximately $148,563,025.00 in 2008 (netting $4,407,578.00 of income), $388,215,114.00 in 2009 (netting $31,949,349.00 of income), $392,895,021.00 in 2010 (netting $48,911,246.00 of income), $412,560,481.00 in 2011 (netting $90,304,394.00 of income), and $417,225,942.00 in 2012 (netting $118,454,086.00 of income).

155. Pinto knew these representations were false and made them for the purpose of inducing the Plaintiffs to invest money into Pure Corp.

156. The Plaintiffs justifiably relied upon these false representations in entering into the Subscription Agreements and investing $5,500,000.00 under the terms thereof.

157. The Plaintiffs' investment is now virtually worthless.

158. During the life of the investment, Pinto, individually and on behalf of Pure Corp., made false representations to the Plaintiffs regarding Pure Corp.'s financial condition and business prospects.

159. Pinto frequently represented to the Plaintiffs that Pure Corp. was improving and that their investment would soon be profitable.

160. These statements were false, and Pinto knew they were false when he made them.

161. These statements were made in order to induce the Plaintiffs' reliance thereon.

162.    The Plaintiffs justifiably relied upon these misrepresentations in refraining from exploring the possibility of selling their shares at a time when they would have been worth more than what they are worth now.

163.    As Pure Corp.'s alter ego, Pure del Peru is liable for the Plaintiffs' injuries to the same extent that Pure Corp. is liable.

164.    As Pure Corp.'s successor through a de facto merger, Pure Holdings is liable for the Plaintiffs' injuries to the same extent that Pure Corp. is liable.

WHEREFORE, the Plaintiffs LIANA CARRIER LTD. and AMIR RIMON respectfully request that this Court enter a judgment against Defendants PURE BIOFUELS CORP., PURE BIOFUELS DEL PERU S.A.C., PURE BIOFUELS HOLDINGS, L.P., and CARLOS ALBERTO PINTO ROCHA for the damages sustained as a result of the fraud, together with Plaintiffs' reasonable attorneys' fees, costs, and such other and further relief as this Court deems appropriate.

## COUNT IV
## AIDING AND ABETTING FRAUD
### (Against G. Goyzueta)

165.    The Plaintiffs reassert the allegations contained in paragraphs 1 through 120 as if fully set forth herein.

166.    The Plaintiffs reassert the allegations contained in paragraphs 152 through 164 as if fully set forth herein.

167.    Pinto, individually and on behalf of Pure Corp., committed fraud by misrepresenting Pure Corp.'s financial condition and business prospects to the Plaintiffs for the purpose of inducing Plaintiffs' reliance thereon.

168.    G. Goyzueta had knowledge of this fraud.

169.   G. Goyzueta knowingly participated in this fraud by preparing the false financial statements that were used to perpetrate the same and by improperly removing the files and computer that he maintained as Pure Corp.'s CFO for the purpose of concealing the fraud.

170.   The Plaintiffs justifiably relied upon Pinto's misrepresentations in entering into the Subscription Agreements and investing $5,500,000.00 under the terms thereof, and in refraining from exploring the possibility of selling their shares at a time when they would have been worth more than what they are worth now.

WHEREFORE, the Plaintiffs LIANA CARRIER LTD. and AMIR RIMON respectfully request that this Court enter a judgment against Defendants GUSTAVO GOYZUETA for the damages sustained as a result of Defendant CARLOS ALBERTO PINTO ROCHA's fraud, together with Plaintiffs' reasonable attorneys' fees, costs, and such other and further relief as this Court deems appropriate.

### COUNT V
### BREACH OF CONTRACT
**(Against Pure Corp., Pure del Peru, and Pure Holdings)**

171.   The Plaintiffs reassert the allegations contained in paragraphs 1 through 120 as if fully set forth herein.

172.   The Subscription Agreements are binding contracts between the Plaintiffs and Pure Corp.

173.   The Subscription Agreements contain the following express representation:

8.4   The Company [Pure Corp.] has filed all reports, schedules, forms, statements and other documents required to be filed by the Company under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date hereof . . . (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein, being collectively referred to herein as the "SEC Reports") . . . As of their respective dates, the SEC Reports

complied in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

Exhibit "A".

174.   The reports that Pure Corp. had filed with the SEC prior to the time that the parties entered into the Subscription Agreements were misleading.

175.   Specifically, Pure Corp.'s public filings understated the costs to complete the Callao Port Facility, overstated the anticipated revenue that would be generated through trading and producing fuel, mischaracterized the transactions with Interpacific, OceanMarine, and other firms owned and/or controlled by insiders, and exaggerated the assets of Interpacific.

176.   Pure Corp. thus breached the Subscription Agreements.

177.   The Plaintiffs would not have entered the Subscription Agreements or invested $5,500,000.00 under the terms thereof had they known that the express representation set forth above was false.

178.   Accordingly, the Plaintiffs have been damaged as a result of Pure Corp.'s breach of the Subscription Agreements.

179.   As Pure Corp.'s alter ego, Pure del Peru is liable for the Plaintiffs' injuries to the same extent that Pure Corp. is liable.

180.   As Pure Corp.'s successor through a de facto merger, Pure Holdings is liable for the Plaintiffs' injuries to the same extent that Pure Corp. is liable.

WHEREFORE, the Plaintiffs LIANA CARRIER LTD. and AMIR RIMON respectfully request that this Court enter a judgment against Defendants PURE BIOFUELS CORP., PURE BIOFUELS DEL PERU S.A.C., and PURE BIOFUELS HOLDINGS, L.P., for the damages

sustained as a result of Defendant PURE BIOFUELS CORP.'s breach of the Subscription Agreements, together with Plaintiffs' reasonable attorneys' fees, costs, and such other and further relief as this Court deems appropriate.

## COUNT VI
## BREACHES OF FIDUCIARY DUTIES
### (Against Pinto, L. Goyzueta, and G. Goyzueta)

181.    The Plaintiffs reassert the allegations contained in paragraphs 1 through 120 as if fully set forth herein.

182.    As shareholders and controlling officers and directors of Pure Corp., Pinto, L. Goyzueta, and G. Goyzueta owed the Plaintiffs and Pure Corp.'s other shareholders fiduciary duties of care, loyalty, and good faith.

183.    Pinto, L. Goyzueta, and G. Goyzueta breached these duties by causing Pure Corp. to enter into agreements and transactions that were extremely disadvantageous to Pure Corp. and its shareholders, and from which they benefited personally at the expense of Pure Corp. and its shareholders.

184.    These transactions include the deals with Interpacific, OceanMarine, FDS, Trimarine, and Plainfield, which effectively destroyed the value and voting privileges associated with the shares held by the Plaintiffs and other minority shareholders.

185.    Pinto additionally breached his fiduciary duties to the Plaintiffs by engaging in conduct which was calculated to and did prevent the submission and consideration of certain competing financing opportunities and bids to purchase Pure del Peru.

186.    The Plaintiffs' $5,500,000.00 investment was rendered practically worthless as a proximate result of these breaches.

WHEREFORE, the Plaintiffs LIANA CARRIER LTD. and AMIR RIMON respectfully request that this Court enter a judgment against Defendants CARLOS ALBERTO PINTO ROCHA, LUIS HUMBERTO GOYZUETA ANGOBALDO, and GUSTAVO GOYZUETA for the damages sustained as a result of their breaches of their fiduciary duties, together with Plaintiffs' reasonable attorneys' fees, costs, and such other and further relief as this Court deems appropriate.

**COUNT VII**
**AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES**
**(Against L. Goyzueta, G. Goyzueta, and Alperstein)**

187.    The Plaintiffs reassert the allegations contained in paragraphs 1 through 120 as if fully set forth herein.

188.    The Plaintiffs reassert the allegations contained in paragraphs 181 through 186 as if fully set forth herein.

189.    Pinto breached his fiduciary duties to the Plaintiffs and Pure Corp.'s other minority shareholders by causing Pure Corp. to enter into certain agreements and transactions that were extremely disadvantageous to Pure Corp. and its shareholders, and from which he benefited personally at the expense of Pure Corp. and its shareholders.

190.    L. Goyzueta knew of these breaches.

191.    L. Goyzueta aided, abetted, and knowingly participated in these breaches by approving of the aforementioned agreements and transactions as a director and CEO of Pure Corp.

192.    Pinto and L. Goyzueta breached their fiduciary duties to the Plaintiffs and Pure Corp.'s other minority shareholders by causing Pure Corp. to enter into certain other agreements

and transactions that were extremely disadvantageous to Pure Corp. and its shareholders, and from which they benefited personally at the expense of Pure Corp. and its shareholders.

193.   G. Goyzueta knew of these breaches.

194.   G. Goyzueta aided, abetted, and knowingly participated in these breaches by approving of the aforementioned agreements and transactions as a director and CFO of Pure Corp., advising Pinto and L. Goyzueta in connection with the same, preparing false financial statements which facilitated the same, and preventing the discovery of material information that would have exposed Pinto's and L. Goyzueta's breaches to Pure Corp.'s independent officers, directors, and auditors.

195.   Alperstein also knew of these breaches, and he aided, abetted, and knowingly participated in the same by advising Pinto and L. Goyzueta in connection therewith.

196.   Pinto additionally breached his fiduciary duties to the Plaintiffs by engaging in conduct which was calculated to and did prevent the submission and consideration of certain competing financing opportunities and bids to purchase Pure del Peru.

197.   Alperstein knew of these breaches.

198.   Alperstein aided, abetted, and knowingly participated in these breaches by helping Pinto prevent Pure Corp.'s Board of Directors from viewing and considering financing opportunities that would have provided better terms than the FDS offers, and by assisting Pinto conceal his ownership interest in FDS.

199.   The Plaintiffs' $5,500,000.00 investment was rendered practically worthless as a proximate result of Pinto's and L. Goyzueta's breaches.

WHEREFORE, the Plaintiffs LIANA CARRIER LTD. and AMIR RIMON respectfully request that this Court enter a judgment against Defendants LUIS HUMBERTO GOYZUETA

ANGOBALDO, GUSTAVO GOYZUETA, and BRIAN S. ALPERSTEIN for the damages sustained as a result of Defendants CARLOS ALBERTO PINTO ROCHA's and LUIS HUMBERTO GOYZUETA ANGOBALDO's breaches of their fiduciary duties, together with Plaintiffs' reasonable attorneys' fees, costs, and such other and further relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

200.    Plaintiffs respectfully demand a jury trial on all issues so triable.

Dated:  May 12th, 2014.

Respectfully submitted,

**EHRENSTEIN CHARBONNEAU CALDERÍN**
*Counsel for Plaintiffs*
501 Brickell Key Drive, Suite 300
Miami, Florida  33131
Phone:        (305) 722-2002
Facsimile:    (305) 722-2001

By:    _____
Christopher B. Spuches, Esq.
New York Bar No.:  2848653
cbs@ecclegal.com

# Exhibit "A"

THIS PRIVATE PLACEMENT SUBSCRIPTION AGREEMENT (THE "SUBSCRIPTION AGREEMENT") RELATES TO AN OFFERING OF SECURITIES IN AN OFFSHORE TRANSACTION TO PERSONS WHO ARE NOT U.S. PERSONS (AS DEFINED HEREIN) PURSUANT TO REGULATION S UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT").

NONE OF THE SECURITIES TO WHICH THIS SUBSCRIPTION AGREEMENT RELATES HAVE BEEN REGISTERED UNDER THE 1933 ACT, OR ANY U.S. STATE SECURITIES LAWS, AND, UNLESS SO REGISTERED, NONE MAY BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED HEREIN) EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S UNDER THE 1933 ACT, PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT, OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND IN EACH CASE ONLY IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.  IN ADDITION, HEDGING TRANSACTIONS INVOLVING THE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE 1933 ACT.

## PRIVATE PLACEMENT SUBSCRIPTION AGREEMENT
### (Non U.S. Subscribers)

TO:      PURE BIOFUELS CORP. (the "Company")
9440 Little Santa Monica Blvd., Suite 400
Beverly Hills, CA 90210

## Purchase of Shares

1.    **SUBSCRIPTION**

1.1    The undersigned (the "Subscriber") hereby irrevocably subscribes for and agrees to purchase ▓▓▓▓▓ shares of the Company's common stock (the "Shares") at a price of $▓▓▓ per share (such subscription and agreement to purchase being the "Subscription"), for an aggregate purchase price of US $▓▓▓▓▓▓ (the "Subscription Proceeds"), which is tendered herewith, on the basis of the representations and warranties and subject to the terms and conditions set forth herein.

1.2    The Company hereby irrevocably agrees to sell, on the basis of the representations and warranties and subject to the terms and conditions set forth herein, to the Subscriber the Shares.  Subject to the terms hereof, the Subscription will be effective upon its acceptance by the Company.

1.3    Unless otherwise provided, all dollar amounts referred to in this Subscription Agreement are in lawful money of the United States of America.

1.4    The offering is not subject to any minimum aggregate subscription level.

2.    **PAYMENT**

2.1    The Subscription Proceeds must accompany this Subscription and shall be wired directly to the Company in accordance with the wire instructions attached hereto as Exhibit A.

NEWY1\8254368.3

*A.K*

**3.   DOCUMENTS REQUIRED FROM SUBSCRIBER**

3.1   The Subscriber must complete, sign and return to the Company the following documents:

    (a)   two (2) executed copies of this Subscription Agreement; and

    (b)   an Accredited Investor Questionnaire in the form attached as <u>Exhibit B</u> (the "Questionnaire").

3.2   The Subscriber shall complete, sign and return to the Company as soon as possible, on request by the Company, any documents, questionnaires, notices and undertakings as may be required by regulatory authorities, the OTC Bulletin Board, stock exchanges and applicable law.

**4.   CLOSING**

4.1   Closing of the offering of the Shares (the "Closing") shall occur on or before August ___ 2009, or on such other date as may be determined by the Company (the "Closing Date"). The Company may, at its discretion, elect to close the offering in one or more closings, in which event the Company may agree with one or more subscribers (including the Subscriber hereunder) to complete delivery of the Shares to such subscriber(s) against payment therefor at any time on or prior to the Closing Date.

**5.   ACKNOWLEDGEMENTS OF SUBSCRIBER**

5.1   The Subscriber acknowledges and agrees that:

    (a)   none of the Shares have been or will be registered under the 1933 Act, or under any state securities or "blue sky" laws of any state of the United States, and, unless so registered, may not be offered or sold in the United States or, directly or indirectly, to U.S. Persons (as defined herein), except in accordance with the provisions of Regulation S under the 1933 Act, pursuant to an effective registration statement under the 1933 Act, or pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the 1933 Act and in each case only in accordance with applicable state and provincial securities laws;

    (b)   the Company has not undertaken, and will have no obligation, to register the Shares under the 1933 Act or any other securities legislation;

    (c)   the Subscriber has received and carefully read this Subscription Agreement;

    (d)   by completing the Questionnaire, the Subscriber is representing and warranting that the Subscriber is an "Accredited Investor", as the term is defined in Rule 501(a) of the 1933 Act;

    (e)   the decision to execute this Subscription Agreement and purchase the Shares agreed to be purchased hereunder has not been based upon any oral or written representation as to fact or otherwise made by or on behalf of the Company and such decision is based entirely upon a review of any public information which has been filed by the Company with the Securities and Exchange Commission (the "SEC") in compliance, or intended compliance, with applicable securities legislation (collectively, the "Public Record");

    (f)   there are risks associated with an investment in the Shares, as more fully described in certain information forming part of the Public Record;

    (g)   the Subscriber and the Subscriber's advisor(s) have had a reasonable opportunity to ask questions of and receive answers from the Company in connection with the sale of the Shares hereunder, and to obtain additional information, to the extent possessed or obtainable by the Company without unreasonable effort or expense;



(h)     the books and records of the Company were available upon reasonable notice for inspection, subject to certain confidentiality restrictions, by the Subscriber during reasonable business hours at its principal place of business and that all documents, records and books in connection with the sale of the Shares hereunder have been made available for inspection by the Subscriber, the Subscriber's attorney and/or advisor(s);

(i)     all of the information which the Subscriber has provided to the Company is correct and complete as of the date the Subscription Agreement is signed, and if there should be any change in such information prior to this Subscription Agreement being executed by the Company, the Subscriber will immediately provide the Company with such information;

(j)     the Company is entitled to rely on the representations and warranties and the statements and answers of the Subscriber contained in this Subscription Agreement and the Questionnaire and the Subscriber will hold harmless the Company from any loss or damage it or they may suffer as a result of the Subscriber's failure to correctly complete this Subscription Agreement or the Questionnaire;

(k)     the issuance and sale of the Shares to the Subscriber will not be completed if it would be unlawful or if, in the discretion of the Company acting reasonably, it is not in the best interests of the Company;

(l)     the Subscriber has been advised to consult the Subscriber's own legal, tax and other advisors with respect to the merits and risks of an investment in the Shares and with respect to applicable resale restrictions, and it is solely responsible (and the Company is not in any way responsible) for compliance with:

        (i)     any applicable laws of the jurisdiction in which the Subscriber is resident in connection with the distribution of the Shares hereunder, and

        (ii)     applicable resale restrictions;

(m)     in addition to resale restrictions imposed under U.S. securities laws, there may be additional restrictions on the Subscriber's ability to resell the Shares under the Subscriber's local laws;

(n)     none of the Shares are listed on any stock exchange or automated dealer quotation system and no representation has been made to the Subscriber that any of the Shares will become listed on any stock exchange or automated dealer quotation system, except that currently certain market makers make market in the common shares of the Company on the OTC Bulletin Board;

(o)     the Subscriber is not a U.S. Person (as defined in Regulation S under the 1933 Act) outside the United States when receiving and executing this Subscription Agreement and is acquiring the Shares as principal for its own account, for investment purposes only, and not with a view to, or for, resale, distribution or fractionalization thereof, in whole or in part, and no other person has a direct or indirect beneficial interest in the Shares;

(p)     none of the Shares may be offered or sold to a U.S. Person or for the account or benefit of a U.S. Person (other than a distributor) prior to the end of the Distribution Compliance Period (as defined herein);

(q)     no documents in connection with this offering have been reviewed by the SEC or any state securities administrators;

(r)     neither the SEC nor any other securities commission or similar regulatory authority has reviewed or passed on the merits of the Shares or has reviewed any documents in connection with the sale of the Shares hereunder;



(s)    the Company will refuse to register the transfer of the Shares not made in accordance with the provisions of Regulation S under the 1933 Act, pursuant to an effective registration statement under the 1933 Act or pursuant to an available exemption from the registration requirements of the 1933 Act and in each case in accordance with applicable state securities laws;

(t)    the Subscriber has not acquired the Shares as a result of, and will not itself engage in, any "directed selling efforts" (as defined in Regulation S under the 1933 Act) in the United States in respect of any of the Shares which would include any activities undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the resale of any of the Shares; provided, however, that the Subscriber may sell or otherwise dispose of any of the Shares pursuant to registration of any of the Shares pursuant to the 1933 Act and any applicable state securities laws or under an exemption from such registration requirements and as otherwise provided herein;

(u)    the statutory and regulatory basis for the exemption claimed for the offer and sale of the Shares, although in technical compliance with Regulation S under the 1933 Act, would not be available if the offering is part of a plan or scheme to evade the registration provisions of the 1933 Act; and

(v)    this Subscription Agreement is not enforceable by the Subscriber unless it has been accepted by the Company, and the Subscriber acknowledges and agrees that the Company reserves the right to reject any Subscription for any reason.

## 6.    REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SUBSCRIBER

6.1    The Subscriber hereby represents and warrants to and covenants with the Company (which representations, warranties and covenants shall survive the Closing) that:

(a)    the Subscriber is not a U.S. Person;

(b)    the Subscriber is not acquiring the Shares for the account or benefit of, directly or indirectly, any U.S. Person;

(c)    the Subscriber is resident in the jurisdiction set out under the heading "Name and Address of Subscriber" on the signature page of this Subscription Agreement;

(d)    the sale of the Shares to the Subscriber as contemplated by the delivery of this Subscription Agreement, the acceptance of it by the Company and the issuance of the Shares to the Subscriber complies with all applicable laws of the Subscriber's jurisdiction of residence or domicile and will not cause the Company to become subject to or comply with any disclosure, prospectus or reporting requirements under any such applicable laws;

(e)    the Subscriber:

    (i)    is knowledgeable of, or has been independently advised as to, the applicable securities laws of the securities regulators having application in the jurisdiction in which the Subscriber is resident (the "International Jurisdiction") which would apply to the acquisition of the Shares;

    (ii)    the Subscriber is purchasing the Shares pursuant to exemptions from prospectus or equivalent requirements under applicable securities laws or, if such is not applicable, the Subscriber is permitted to purchase the Shares under the applicable securities laws of the securities regulators in the International Jurisdiction without the need to rely on any exemptions;



(iii)   the applicable securities laws of the authorities in the International Jurisdiction do not require the Company to make any filings or seek any approvals of any kind whatsoever from any securities regulator of any kind whatsoever in the International Jurisdiction in connection with the issue and sale or resale of the Shares; and

(iv)   the purchase of the Shares by the Subscriber does not trigger:

A.   any obligation to prepare and file a prospectus or similar document, or any other report with respect to such purchase in the International Jurisdiction; or

B.   any continuous disclosure reporting obligation of the Company in the International Jurisdiction; and

the Subscriber will, if requested by the Company, deliver to the Company a certificate or opinion of local counsel from the International Jurisdiction which will confirm the matters referred to in subparagraphs (ii), (iii) and (iv) above to the satisfaction of the Company, acting reasonably;

(f)   the Subscriber (i) has adequate net worth and means of providing for its current financial needs and possible personal contingencies, (ii) has no need for liquidity in this investment, and (iii) is able to bear the economic risks of an investment in the Shares for an indefinite period of time, and can afford the complete loss of such investment;

(g)   all information contained in the Questionnaire and the Questionnaire is complete and accurate and may be relied upon by the Company, and the Subscriber will notify the Company immediately of any material change in any such information occurring prior to the closing of the purchase of the Shares;

(h)   the Subscriber is purchasing the Shares as principal for investment only and not with a view to, or for, resale, distribution or fractionalization thereof, in whole or in part, and, in particular, it has no intention to distribute either directly or indirectly any of the Shares in the United States or to U.S. Persons;

(i)   the Subscriber is outside the United States when receiving and executing this Subscription Agreement;

(j)   the Subscriber understands and agrees that offers and sales of any of the Shares prior to the expiration of a period of one year after the date of original issuance of the Shares (the one year period hereinafter referred to as the "Distribution Compliance Period") shall only be made in compliance with the safe harbor provisions set forth in Regulation S under the 1933 Act, pursuant to the registration provisions of the 1933 Act or an exemption therefrom, and that all offers and sales after the Distribution Compliance Period shall be made only in compliance with the registration provisions of the 1933 Act or an exemption therefrom and in each case only in accordance with applicable state and provincial securities laws;

(k)   the Subscriber understands and agrees not to engage in any hedging transactions involving any of the Shares unless such transactions are in compliance with the provisions of the 1933 Act and in each case only in accordance with applicable state and provincial securities laws;

(l)   the Subscriber acknowledges that it has not acquired the Shares as a result of, and will not itself engage in, any "directed selling efforts" (as defined in Regulation S under the 1933 Act) in the United States in respect of any of the Shares which would include any activities undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the resale of any of the Shares; provided, however, that the Subscriber may sell or otherwise dispose of any of the Shares pursuant to registration of any of the Shares pursuant

to the 1933 Act and any applicable state securities laws or under an exemption from such registration requirements and as otherwise provided herein;

(m)     the Subscriber (i) is able to fend for itself in the Subscription; (ii) has such knowledge and experience in business matters as to be capable of evaluating the merits and risks of its prospective investment in the Shares; and (iii) has the ability to bear the economic risks of its prospective investment and can afford the complete loss of such investment;

(n)     the Subscriber is aware that an investment in the Company is speculative and involves certain risks, including the possible loss of the investment;

(o)     the Subscriber has received and carefully read this Subscription Agreement;

(p)     the Subscriber has made an independent examination and investigation of an investment in the Shares and the Company and has depended on the advice of its legal and financial advisor.

(q)     the Subscriber has the requisite knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the investment in the Shares and the Company and the Subscriber is providing evidence of such knowledge and experience in these matters through the information requested in the Questionnaire;

(r)     the Subscriber understands and agrees that the Company and others will rely upon the truth and accuracy of the acknowledgements, representations and agreements contained in this Subscription Agreement and the Questionnaire and agrees that if any of such acknowledgements, representations and agreements are no longer accurate or have been breached, it shall promptly notify the Company;

(s)     the Subscriber has the legal capacity and competence to enter into and execute this Subscription Agreement and to take all actions required pursuant hereto and, if the Subscriber is a corporation, it is duly incorporated and validly subsisting under the laws of its jurisdiction of incorporation and all necessary approvals by its directors, shareholders and others have been obtained to authorize execution and performance of this Subscription Agreement on behalf of the Subscriber;

(t)     the entering into of this Subscription Agreement and the transactions contemplated hereby do not result in the violation of any of the terms and provisions of any law applicable to, or, if applicable, the constating documents of, the Subscriber or of any agreement, written or oral, to which the Subscriber may be a party or by which the Subscriber is or may be bound;

(u)     the Subscriber has duly executed and delivered this Subscription Agreement and it constitutes a valid and binding agreement of the Subscriber enforceable against the Subscriber;

(v)     the Subscriber is not an underwriter of, or dealer in, the common shares of the Company, nor is the Subscriber participating, pursuant to a contractual agreement or otherwise, in the distribution of the Shares;

(w)     the Subscriber understands and agrees that none of the Shares have been registered under the 1933 Act, or under any state securities or "blue sky" laws of any state of the United States, and, unless so registered, may not be offered or sold in the United States or, directly or indirectly, to U.S. Persons except in accordance with the provisions of Regulation S under the 1933 Act, pursuant to an effective registration statement under the 1933 Act, or pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the 1933 Act;

(x)     the Subscriber understands and agrees that the Company will refuse to register any transfer of the Shares not made in accordance with the provisions of Regulation S under the 1933 Act, pursuant



to an effective registration statement under the 1933 Act or pursuant to an available exemption from the registration requirements of the 1933 Act;

(y)    the Subscriber is not aware of any advertisement of any of the Shares and is not acquiring the Shares as a result of any form of general solicitation or general advertising including advertisements, articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio or television, or any seminar or meeting whose attendees have been invited by general solicitation or general advertising;

~~(z)    no person has made to the Subscriber any written or oral representations;~~

    (i)    that any person will resell or repurchase any of the Shares;

    (ii)    that any person will refund the purchase price of any of the Shares;

    (iii)    as to the future price or value of any of the Shares; or

    (iv)    that any of the Shares will be listed and posted for trading on any stock exchange or automated dealer quotation system or that application has been made to list and post any of the Shares of the Company on any stock exchange or automated dealer quotation system, except that currently certain market makers make market in the common shares of the Company on the OTC Bulletin Board;

(aa)    the Subscriber is (check one or more of the following boxes):

    (a)    a director, executive officer or control person of the Company or an affiliate of the Company     ☐

    (b)    a spouse, parent, grandparent, brother, sister or child of a director, executive officer or control person of the Company or an affiliate of the Company     ☐

    (c)    a parent, grandparent, brother, sister or child of the spouse of a director, executive officer or control person of the Company or an affiliate of the Company     ☐

    (d)    a close personal friend of a director, executive officer or control person of the Company or an affiliate of the Company     ☐

    (e)    a close business associate of a director, executive officer or control person of the Company or an affiliate of the Company     ☐

    (f)    a founder of the Company or a spouse, parent, grandparent, brother, sister, child, close personal friend or close business associate of a founder of the Company     ☐

    (g)    a parent, grandparent, brother, sister or child of the spouse of a founder of the Company     ☐

    (h)    a company, partnership or other entity which a majority of the voting securities are beneficially owned by, or a majority of the directors are, persons or companies as described in paragraphs (a) to (g) above     ☐

    (i)    an accredited investor     X☐

(bb)    if the undersigned has checked one or more of boxes (b), (c), (d), (e), (f), (g) or (h) in Section 6.1(aa) above, the director(s), executive officer(s), control person(s) or founder(s) of the Company with whom the undersigned has the relationship is:



    7

(Instructions to undersigned: fill in the name of each director, executive officer, founder and control person which you have the above-mentioned relationship with and describe the relationship. If you have checked box (h) in Section 6.1(aa) above, also indicate which of (a) to (g) describes the securityholders or directors which qualify you as box h and provide the names of those individuals. Please attach a separate page if necessary); and

(cc)     if the Subscriber has checked box (j) in Section 6.1(aa) above, the Subscriber acknowledges and agrees that the Company shall not consider the Subscriber's Subscription for acceptance unless the undersigned provides to the Company, along with an executed copy of this Agreement:

       (i)     a fully completed and executed Accredited Investor Questionnaire in the form attached hereto as Exhibit B; and

       (ii)     such other supporting documentation that the Company or its legal counsel may request to establish the Subscriber's qualification as an accredited investor.

(dd)     the Subscriber has not engaged any brokers, finders or agents, and neither the Company nor any other subscriber has, nor will, incur, directly or indirectly, as a result of any action taken by the Subscriber, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Subscription Agreement.

6.2     In this Subscription Agreement, the term "U.S. Person" shall have the meaning ascribed thereto in Regulation S under the 1933 Act.

## 7.     REPRESENTATIONS AND WARRANTIES WILL BE RELIED UPON BY THE COMPANY

7.1     The Subscriber acknowledges that the representations and warranties contained herein in the Questionnaire and in the Questionnaire are made by it with the intention that such representations and warranties may be relied upon by the Company and its legal counsel in determining the Subscriber's eligibility to purchase the Shares under applicable securities legislation, or (if applicable) the eligibility of others on whose behalf it is contracting hereunder to purchase the Shares under applicable securities legislation. The Subscriber further agrees that by accepting delivery of the certificates representing the Shares on the Closing Date, it will be representing and warranting that the representations and warranties contained herein in the Questionnaire and in the Questionnaire are true and correct as at the Closing Date with the same force and effect as if they had been made by the Subscriber on the Closing Date and that they will survive the purchase by the Subscriber of Shares and will continue in full force and effect notwithstanding any subsequent disposition by the Subscriber of such Shares.

## 8.     REPRESENTATIONS OF THE COMPANY

8.1     The Company has the corporate power and authority to execute, deliver and perform the terms and provisions of this Agreement and has taken all necessary corporate action to authorize the execution, delivery and performance by it of this Agreement. The Company has duly executed and delivered this Agreement, and this Agreement constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

8.2     No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, the Company to authorize, or is required to be obtained or made by, or on behalf of, the Company in connection with (a)



the execution, delivery and performance of this Agreement, (b) the legality, validity, binding effect or enforceability of this Agreement, or (c) the issuance of the Exchange Shares to LLCII and the registration of the Exchange Shares with the Transfer Agent.

8.3     Neither the execution, delivery or performance by the Company of this Agreement, nor compliance by it with the terms and provisions thereof, (a) will contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority, (b) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of the Company or any of its Subsidiaries.

8.4     The Company has filed all reports, schedules, forms, statements and other documents required to be filed by the Company under the Securities Act and the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date hereof (or such shorter period as the Company was required by law or regulation to file such material) (the foregoing materials, including the exhibits thereto and documents incorporated by reference therein, being collectively referred to herein as the "SEC Reports") on a timely basis or has received a valid extension of such time of filing and has filed any such SEC Reports prior to the expiration of any such extension. As of their respective dates, the SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act, as applicable, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The Company has never been an issuer subject to Rule 144(i) under the Securities Act. The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved ("GAAP"), except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of the Company and its consolidated Subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments.

8.5     The Company hereby certifies that as of the date hereof, and not including the transaction contemplated herein, that the capitalization structure of the Company is as set forth in Schedule 4.7 to this Agreement.


## 9.     RESALE RESTRICTIONS

9.1     The Subscriber acknowledges that any resale of the Shares will be subject to resale restrictions contained in the securities legislation applicable to each Subscriber or proposed transferee. The Subscriber acknowledges that the Shares have not been registered under the 1933 Act of the securities laws of any state of the United States and that the Company does not intend to register same under the 1933 Act, or the securities laws of any such state and has no obligation to do so. The Shares may not be offered or sold in the United States unless registered in accordance with federal securities laws and all applicable state and provincial securities laws or exemptions from such registration requirements are available.

## 10.     ACKNOWLEDGEMENT AND WAIVER

10.1     The Subscriber has acknowledged that the decision to purchase the Shares was solely made on the basis of publicly available information contained in the Public Record. The Subscriber hereby waives, to the fullest extent permitted by law, any rights of withdrawal, rescission or compensation for damages to which the Subscriber might be entitled in connection with the distribution of any of the Shares.



## 11.    LEGENDING AND REGISTRATION OF SUBJECT SECURITIES

11.1    The Subscriber hereby acknowledges that upon the issuance thereof, and until such time as the same is no longer required under the applicable securities laws and regulations, the certificates representing any of the Shares will bear a legend in substantially the following form:

> THE SECURITIES REPRESENTED HEREBY HAVE BEEN OFFERED IN AN OFFSHORE TRANSACTION TO PERSONS WHO ARE NOT U.S. PERSONS (AS DEFINED HEREIN) PURSUANT TO REGULATION S UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"). NONE OF THE SECURITIES HAVE BEEN REGISTERED UNDER THE 1933 ACT, OR ANY U.S. STATE SECURITIES LAWS, AND, UNLESS SO REGISTERED, NONE MAY BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED HEREIN) EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S UNDER THE 1933 ACT, PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT, OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND IN EACH CASE ONLY IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.   IN ADDITION, HEDGING TRANSACTIONS INVOLVING THE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE 1933 ACT.

11.2    The Subscriber hereby acknowledges and agrees to the Company making a notation on its records or giving instructions to the registrar and transfer agent of the Company in order to implement the restrictions on transfer set forth and described in this Subscription Agreement.

## 12.    COLLECTION OF PERSONAL INFORMATION

12.1    The Subscriber acknowledges and consents to the fact that the Company is collecting the Subscriber's personal information for the purpose of fulfilling this Subscription Agreement and completing the offering.   The Subscriber's personal information (and, if applicable, the personal information of those on whose behalf the Subscriber is contracting hereunder) may be disclosed by the Company to (a) stock exchanges or securities regulatory authorities, (b) the Company's registrar and transfer agent and (c) any of the other parties involved in the offering, including legal counsel, and may be included in record books in connection with the offering.   By executing this Subscription Agreement, the Subscriber is deemed to be consenting to the foregoing collection, use and disclosure of the Subscriber's personal information (and, if applicable, the personal information of those on whose behalf the Subscriber is contracting hereunder) and to the retention of such personal information for as long as permitted or required by law or business practice.   Notwithstanding that the Subscriber may be purchasing Shares as agent on behalf of an undisclosed principal, the Subscriber agrees to provide, on request, particulars as to the identity of such undisclosed principal as may be required by the Company in order to comply with the foregoing.

## 13.    COSTS

13.1    The Subscriber acknowledges and agrees that all costs and expenses incurred by the Subscriber (including any fees and disbursements of any special counsel retained by the Subscriber) relating to the purchase of the Shares shall be borne by the Subscriber.

## 14.    GOVERNING LAW

14.1    This Subscription Agreement is governed by the laws of the State of New York.   The Subscriber, in its personal or corporate capacity and, if applicable, on behalf of each beneficial purchaser for whom it is acting, irrevocably attorns to the jurisdiction of the State of New York.



**15.     SURVIVAL**

15.1     This Subscription Agreement, including without limitation the representations, warranties and covenants contained herein, shall survive and continue in full force and effect and be binding upon the parties hereto notwithstanding the completion of the purchase of the Shares by the Subscriber pursuant hereto.

**16.     ASSIGNMENT**

16.1     This Subscription Agreement is not transferable or assignable.

**17.     EXECUTION**

17.1     The Company shall be entitled to rely on delivery by facsimile machine of an executed copy of this Subscription Agreement and acceptance by the Company of such facsimile copy shall be equally effective to create a valid and binding agreement between the Subscriber and the Company in accordance with the terms hereof.

**18.     SEVERABILITY**

18.1     The invalidity or unenforceability of any particular provision of this Subscription Agreement shall not affect or limit the validity or enforceability of the remaining provisions of this Subscription Agreement.

**19.     ENTIRE AGREEMENT**

19.1     Except as expressly provided in this Subscription Agreement and in the agreements, instruments and other documents contemplated or provided for herein, this Subscription Agreement contains the entire agreement between the parties with respect to the sale of the Shares and there are no other terms, conditions, representations or warranties, whether expressed, implied, oral or written, by statute or common law, by the Company or by anyone else.

**20.     NOTICES**

20.1     All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed or transmitted by any standard form of telecommunication.  Notices to the Subscriber shall be directed to the address on page 12 of this Subscription Agreement and notices to the Company shall be directed to the address on page 1 of this Subscription Agreement.

**21.     COUNTERPARTS**

21.1     This Subscription Agreement may be executed in any number of counterparts, each of which, when so executed and delivered, shall constitute an original and all of which together shall constitute one instrument.

[Remainder of page intentionally left blank.]



**IN WITNESS WHEREOF** the Subscriber has duly executed this Subscription Agreement as of the date of acceptance by the Company.

## DELIVERY AND REGISTRATION INSTRUCTIONS

1.    Delivery - please deliver the Share certificates to:

LIANA CARRIER LTD

C/O  MARIMED  AGENCIES  (UK)  LTD  –  27  FISHERS  LANE,  LONDON  W4  1RX,      U.K.

2.    Registration - registration of the certificates which are to be delivered at closing should be made as follows:

LIANA CARRIER LTD
(name)

C/O MARIMED AGENCIES (UK) LTD – 27 FISHERS LANE, LONDON W4 1RX, U.K.
(address)

The undersigned hereby acknowledges that he or she will deliver to the Company all such additional completed forms in respect of the Subscriber's purchase of the Shares as may be required for filing with the appropriate securities commissions and regulatory authorities.

LIANA CARRIER LTD
(Name of Subscriber – Please type or print)


(Signature and, if applicable, Office)

80 BROAD STREET,
(Address of Subscriber)

MONROVIA
(City, State or Province, Postal Code of Subscriber)

LIBERIA
(Country of Subscriber)

## ACCEPTANCE

The above-mentioned Subscription Agreement in respect of the Shares is hereby accepted by PURE BIOFUELS CORP.

DATED at <u>LONDON</u>, the <u>8</u> day of <u>AUGUST</u> , <u>2008</u>.

**PURE BIOFUELS CORP.**

Per:    _____
            Authorized Signatory



**EXHIBIT B**

**Pure Biofuels Corp.**

**ACCREDITED INVESTOR QUESTIONNAIRE**

**INSTRUCTIONS:**

        PLEASE ANSWER ALL QUESTIONS. If the appropriate answer is "None" or "Not Applicable", so state. Please print or type your answers to ALL questions. Attach additional sheets if necessary to complete your answers to an item.

        Your answers will be kept strictly confidential at all times. However, Pure Biofuels Corp (the "Company") may present this Questionnaire to such parties as it deems appropriate in order to assure itself that the offer and sale of securities will not result in a violation of the registration provisions of the U.S. Securities Act of 1933, as amended, or a violation of the securities laws of any state.

1.      Please provide the following information:

Name:   LIANA CARRIER LTD

Name of additional purchaser: _____

                    (Please complete information in Question 5)

Date of birth, or if other than an individual, year of organization or incorporation:  APRIL 2, 2007

2.      Residence address, or if other than an individual, principal office address:

      80 BROAD STREET, MONROVIA, LIBERIA

_____

Telephone Number: _____NONE_____

Social Security Number: __NONE_____

Taxpayer Identification Number: __NONE_____

3.      Business Address:  27 FISHERS LANE, LONDON W4 1RX    U.K.

_____

Business Telephone Number:   44-208-7423535

4.      Send mail to:    Residence _____    Business _X___  (Check one)

5.      With respect to tenants in common, joint tenants and tenants by the entirety, complete only if information differs from that above:

Residence Address: _____

Telephone Number: _____

Social Security Number: _____

Taxpayer Identification Number: _____

Business Address: _____

_____

_____

Business Telephone Number: _____

Send mail to:  Residence _____     Business _____   (Check one)

6.      Please describe your present or most recent business or occupation and indicate such information as the nature of your employment, how long you have been employed there, the principal business of your employer, the principal activities under your management or supervision and the scope (e.g. dollar volume, industry rank, etc.) of such activities:

_____   SHIPPING BUSINESS   _____

_____

7.      Applicable to individuals ONLY.  Please answer the following questions concerning your financial condition as an "accredited investor" (within the meaning of Rule 501 of Regulation D promulgated under the Act).  If the Purchaser is more than one individual, each individual must initial an answer where the question indicates a "yes" or "no" response and must answer any other question fully, indicating to which individual it applies.  If the purchaser is purchasing jointly with his or her spouse, one answer may be indicated for the couple as a whole:

7.1     Does your net worth* (or joint net worth with your spouse) exceed $1,000,000?

_____                              _____

Yes                                                    No

7.2     Did you have an individual income** in excess of $200,000 or joint income together with your spouse in excess of $300,000 in each of the two most recent years (2006 and 2007) and do you reasonably expect to reach the same income level in the current year (2008)?

_____                              _____

Yes                                                    No

*For purposes hereof net worth shall be deemed to include ALL of your assets, liquid or illiquid (including such items as home, furnishings, automobile and restricted securities) MINUS any liabilities (including such items as home mortgages and other debts and liabilities).

**For purposes hereof the term "income" is not limited to "adjusted gross income" as that term is defined for federal income tax purposes, but rather includes certain items of income which are deducted in computing "adjusted gross income".  For investors who are salaried employees, the gross salary of such investor, minus any significant expenses personally incurred by such investor in connection with earning the salary, plus any income from any other source including unearned income, is a fair measure of "income" for purposes hereof.  For investors



who are self-employed, "income" is generally construed to mean total revenues received during the calendar year minus significant expenses incurred in connection with earning such revenues.

7.3.    Applicable to Corporations, Partnerships and other Entities ONLY:

The purchaser is an accredited investor because the purchaser falls within at least one of the following categories (Check all appropriate lines):

____    (i)    bank as defined in Section 3(a)(2) of the Act or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity;

____    (ii)    a broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended;

____    (iii)    an insurance partnership as defined in Section 2(13) of' the Act;

____    (iv)    an investment partnership registered under the Investment Partnership Act of' 1940, as amended (the "Investment Act") or a business development partnership as defined in Section 2(a)(48) of the Investment Act;

____    (v)    a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, as amended;

____    (vi)    a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, where such plan has total assets in excess of $5,000,000.

____    (vii)    an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, as amended (the "Employee Act"), where the investment decision is made by a plan fiduciary, as defined in Section 3(21) of the Employee Act, which is either a bank, savings and loan association, insurance Partnership, or registered investment adviser, or an employee benefit plan that has total assets in' excess of $5,000,000 or a self-directed plan the investment decisions of which are made solely by persons that are accredited investors;

____    (viii)    a private business development partnership, as defined in Section 202(a)(22) of the Investment Advisers Act of 1940 as amended;

_X__    (ix)    an organization described in Section 501(c)(3) of the Internal Revenue Code, a corporation, a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

____    (x)    a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a "sophisticated" person, who has such knowledge and experience in financial and business matters that he is capable of' evaluating the merits and risks of the prospective investment;

____    (xi)    an entity in which all of the equity investors are persons or entities described above ("accredited investors"). **ALL EQUITY OWNERS MUST COMPLETE EXHIBIT "A" ATTACHED HERETO.**



8.      Investor Representations and Warranties.

The undersigned hereby acknowledges, represents and warrants to, and agrees with, the Company and its affiliates as follows:

(a)      The information in the Accredited Investor Questionnaire completed and executed by the undersigned is accurate and true in all respects and the undersigned is an "accredited investor," as that term is defined in Rule 501 of Regulation D.

(b)      The undersigned agrees to provide to the Company such supporting documentation for any responses to this Questionnaire as the Company may reasonably request. Any information which the undersigned has heretofore furnished to the Company with respect to his financial position and business experience is correct and complete as of the date set forth below and if there should be any material change in such information he will immediately furnish such revised or corrected information to the Company.

Dated: AUGUST 8, 2008

**IF THE PURCHASER IS ONE OR MORE INDIVIDUALS (ALL INDIVIDUALS MUST SIGN):**

_____
(Type or print name of beneficial owner)

_____
Signature of prospective purchaser

_____
Social Security Number

_____
(Type or print name of additional purchaser)

_____
Signature of spouse, joint tenant, tenant in common or other signature, if required

_____
Social Security Number

_____

**IF THE PURCHASER IS A CORPORATION, PARTNERSHIP OR OTHER ENTITY:**

LIANA CARRIER LTD
(Name of Entity - Please Print)

NONE
Taxpayer Identification Number

_____

By: _____

Name: RIMON AMIR

Title: DIRECTOR